Good morning. I'm Mary Marsh Lindy. Do I have this right? Mary Marsh Lindy, attorney for the appellant John Lawson, beneficiary of the trusts at issue. I'm happy to answer any questions you have. I understand it's not for me to make a pitch at this point. Right? Well, you may present your argument and whatever you think is important for us to know. Well, my brief attempted to lay out how trusts should be administered and how trustees should interact with their beneficiaries. And each one of the underlying cases, including the 2006 one in Arizona, the 2013 one in Los Angeles, and the 2015 one in Reno, Nevada, were brought to it to, well, the 2013 and 2015 ones were brought to try to bring the trustee William Lawson to abide by his duties to his younger brother, John Lawson, and to distribute the funds to the beneficiaries. The biggest challenge was that Bill Lawson commingled the funds from other trusts into the irrevocable trust. And that had the effect of diverting funds that were directly payable to John as an equal one-sixth beneficiary of the trust. Bill and John were all beneficiaries of the same master trust, the Maritime Trust, and the Sharon Lawson Exempt Trust. But instead, what happened was that Bill went to Arizona, where he hadn't properly moved jurisdiction of the California trust. He had an action in Arizona to cut the irrevocable trust into shares. It was presumably equal shares. He cut them 80-20, leaving John only 20 and inserting a term requiring dire and extreme circumstances in order to obtain any benefits of the health and welfare trust. So what that basically did was cut John down to 20%, and that 20% was calculated as of the original cash funding of the irrevocable trust at about $43,000. So basically, as of February 2008, Bill told John that he had no more money in that trust. Subsequent to 2008 and 2011, money started pouring in from the Maritime Trust, which were John's share of maritime funds, came into the irrevocable trust. And that money was thereafter locked up by Bill because he didn't account for the incoming yes. I understand that your client is very unhappy about the history of the management of these various trusts. I appreciate that. But as I understand this record, there was a settlement agreement that was entered into between your client and the Lawsons that resolved all of these claims. Why isn't that the end of the matter? Well, because it was a forced resolution. Were you his counsel? I'm sorry? Were you his counsel? Yes, I was. Did you make any complaint at the time? Yes, I did. Why did you have him sign it then? Because Bill, on the opening paper in Los Angeles, spent $28,000 in attorney's fees. And his attorney, Larry Bemis, stood in the hallway on our first appearance and said he will spend the trust to zero unless John gives Bill a release. And $28,000 out of a cash trust at that time, the original trust would have been all spent down by attorney's fees and costs. So when you were told by opposing counsel that you're not going to get any benefit of any trust unless you get another court order, we sought a petition. Well, I understood the statement to be that if we keep litigating this case, the trust is going to be spent down to virtually nothing. That seems to me to be a realistic assessment of what was going on here. I mean, lawyers were being paid, money was being spent, and it seemed prudent to resolve the case and eliminate the continuing expenditure of attorney fees. That doesn't make what Bill was doing lawful or consistent with his fiduciary duties, respectfully, Your Honor, because he had a duty to disclose to John. Well, but I guess I'm troubled here by the fact that he had counsel, and you apparently advised him to sign the agreement, notwithstanding all of this problematic undue influence and the like. Yes, he had counsel. But the problem was that if he did not accept Bill's cram-down at that time, and remember that Bill never told John how much of that influx of $152,000 was going to go to John versus going to Tiffany, who was not a beneficiary of those trusts. In order to even get an accounting, he would have spent more money. Bill would have spent more of the trust money on attorney's fees. Counsel, Judge Gould, if I could interject one question. Did you ever tell the judge in the case that your client was signing this agreement under duress? Yes, I did. I explained that, and I testified to it, and it was in our briefs. Well, the district court said that you had other options other than to spend down the trust, and you could have frozen the trust while it was litigated. Well. Where did the district court go wrong when it had a trial and findings that went against you? I'm sorry. I'm hard of hearing. I'm sorry. I'm asking, the district court said that you could have frozen the trust and proceeded with the litigation. You didn't have to spend down. And so I'm wondering what, where the district court went wrong. Well, because if we spent, if Bill's attorneys spent $28,000 on the first paper, going through a motion to freeze the trust assets and prevent him from using any more of them would have probably brought another paper, another motion, and there would have been huge additional attorney's fees. And like Larry Bemis told me, I will spend the trust to zero unless you give Bill, yeah, give Bill a release. There was a consistent, as we pointed out in the brief. Where in the record, counsel, where in the record can you cite me to where you told the judge that what you just said? It's in the trial transcript, Your Honor. Can you give me a page sign? And I also included email exchanges with Mr. Bemis. My question is, can you give us a record cite? If you can't, don't bother. Although it certainly helps to expedite if we know where something is that you're talking about. Yes. It's in the exchange of emails between Mr. Bemis and me around, between March and May of 2011. Okay. And it's cited in your brief. Yes. Okay. Well, thank you. I'm sorry. Well, we'll give you some time on rebuttal because you have about two minutes left. If you'd like to reserve it, you can come back then and give us the citation. Yes, I'd like to reserve. Thank you. Thank you. Good morning. May it please the Court. My name is Janice Proctor Murphy with the law firm of Fenimore Craig on behalf of appellees Bill Lawson and Sharon Andrejko. The issue before this Court is whether the trial court following a two-day bench trial properly held that John Lawson's alleged theories of rescission, illegality, undue influence, and coercion based on economic duress failed to provide a basis to set aside the settlement agreement. Given that the trial court's findings of fact and conclusions of law were amply supported by the evidence as well as the applicable law, the judgment below should be affirmed. I'd like to start off by just commenting on a couple of questions that were asked opposing counsel, Ms. Lindy. The question, Judge Gohl, was did she ever tell the judge that her client was under undue influence? And I think there was just a miscommunication. Ms. Lundy, in fact, during the trial in 2015 did tell that judge that she thought her client signed it under undue influence. Correct. But she never told the judge in the California petition when that was filed that she thought that her client was being required to settle under undue influence and, in fact, dismiss the matter without ever communicating to the court. Ms. Lundy also referenced an exchange of emails between her and my client's counsel at the time, Mr. Bemis. In those communications, the most that was said is he was settling because he thought he needed the money for health concerns. At the same time, Your Honor, in those same email exchange, my client's counsel would certainly pay John's health expenses if he submitted those funds verified, not funds, if he submitted verified documented medical expenses, that those would be paid. The trial record shows that at no time was any medical bill submitted since 2008 from John to Bill. I'd like to just touch briefly on the three bases of rescission and basically why the trial court decided as it did. The first basis was illegality. Illegality under California Probate Code 16004.5. And in that basis of illegality, and that is the sole argument of illegality, that code section provides that you can't require in exchange for mandatory distributions, you cannot require that you get a release in exchange for mandatory distributions. That code section, Your Honor, is wholly inapplicable here because of the discretionary nature of this trust. All payments to John were discretionary. In fact, the primary beneficiary of this trust was John's daughter, Tiffany, for her education and support. And after the reform of the trust in 2006 in Arizona, even those discretionary distributions could only be made if there were dire and extreme circumstances that were verified. Second in this case, the trial court found that Bill never required a release in exchange for mandatory distributions. That was a factual finding. Given it is a bench trial, that factual finding is reviewed for clear error and is entitled to substantial deference. As to undue influence, as this court knows, that is excessive pressure that overcomes a party's free will. Courts look at a totality of circumstances. In this case, the trial court correctly found that Bill did not engage in any conduct that overcame the free will of John. Counsel, are there cases that say in the relevant jurisdiction here that someone's free will can be overcome when they're represented by counsel? Your Honor, I think that, in fact, there's a couple of cases that state that when a client is represented by counsel, and I think it's the Ramirez and the agreement, when someone is represented by counsel and the terms of the agreement are fair, then that shows that the agreement is fair and equitable and they're being represented properly. Okay, thank you. I think that two things are important to note. One, Judge Gould, as you just mentioned, that, in fact, John was represented throughout these entire settlement negotiations that lasted several months by counsel. Second, the trial court made a determination that the settlement agreement was fair and equitable. John's basis of saying that he needed to settle was his health condition, that he needed money for his health condition. In fact, what the record showed that he claimed he needed money for rotting teeth at the time, the record showed he had a $6,000 credit with his dentist at that time. In addition, there was no evidence presented that John's anticipated medical expenses exceeded his need. There were no requirements imposed on John to sign the agreement on a certain day or in a certain manner. He signed it at his attorney's office with his attorney present when she thought he was capable of doing it. There was no communication between John and Bill. And John and his attorney, importantly, understood, both of them testified, at the time they entered into this agreement it was final and binding. What about the claim by Ms. Lindy that the primary reason why John signed the agreement was to avoid the threat of spending down the trust? Well, Your Honor, the record doesn't support that. In fact, the record in the testimony of his deposition said the statements in the hallway, that alleged statement of spending the funds down to zero, did not enter into his equation. He was concerned about the medical expenses. But the trial court found that no such threat was made. Basically, it was an observation that we find this litigation to be meritless, and therefore, if you continue on it, we will be required to defend it. It's important to note that the terms of the trust allow, in fact, the trustee to use trust monies to defend a lawsuit. And, in fact, there was a reason to defend the lawsuit because, again, Tiffany is the primary beneficiary, John's daughter of this trust. And so it was reasonable for Bill to say, can we try and resolve this matter and get it finalized? If this was all before the district court when the district court made its findings. And in turn, Your Honor, there were options available to them. John and his counsel were aware that all they needed to do was submit medical bills, and those medical bills would be paid. There was a statement that John did not know how much money was in the trust. In fact, the record will show in August of 2012, almost a year prior to the settlement, that an accounting was sent to Ms. Lindy and indicated those funds were in the account. And so all of the information, it's important to note, there is no fact here that wasn't known at the time that the settlement agreement was entered into. This is not a situation where a new trustee takes over, and after the new trustee takes over, then they find facts that cause them concern. Every fact here was known. Finally, just to wrap up, there is no economic duress for the same reasons of undue influence. There is no overcoming of someone as well. And there's simply no evidence that Bill, who never even took a trustee fee, did anything untoward here. For those reasons, Your Honor, we ask that the district court's judgment be affirmed. Thank you. Thank you. Ms. Lindy, you have about two minutes. Yes. It's important to bear in mind that the money that was accounted for in the trust of about $152,000 consisted entirely of money from the Maritime Trust. The Maritime Trust was John's share of the family trust, and Tiffany was not a beneficiary of that. And therefore, to say that there was $152,000 accounted for doesn't comply with Bill's obligation to divide those sums between himself and Tiffany, because the way he left it in 2006 was that money in the irrevocable trust, the IT, was 80% Tiffany's and 20% John's. But that was before the Maritime Trust money came in to the irrevocable trust in violation of the terms of the trust, because those were not supposed to be merged. And therefore, John's 100% interest in that $152,000 got put into the irrevocable trust with no declaration from Bill how much of that 152 was available to John, because the last time he told John in 2008 that his share was exhausted, there was no subsequent statement from Bill that any part of that 152 was available to him and how much was available to Tiffany, and no distributions were made out of that 152 once it came in. So that was the crux of the problem, is that John was basically disinherited from his share of the Maritime Trust, and Bill would not give him any of that without a release. And so we continue to assert that the requirement of a release violated John's right to a disbursement. I think we understand your position. Your time is just about up. We understand your position and your time has expired. Are there any further questions from the other judges? It's not done here. Thank you. Thank you very much for the presentations of both counsel. The case just argued is submitted for decision. The next case, Wong v. Sessions, is also submitted on the briefs, as is the following case, Lozalda v. Zuniga, and both cases are ordered submitted on the briefs. We'll hear the next case for argument, which is sued, I may be pronouncing that wrong, v. Costco.
judges: Diaz, Schroeder, Gould